IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DIANE SHARICK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 05-1384 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

### **I. INTRODUCTION**

Plaintiff, Diane Sharick, seeks judicial review of a decision of defendant, Jo Anne B. Barnhart, Commissioner of Social Security ("the Commissioner"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, plaintiff's motion for summary judgment will be granted, the Commissioner's cross-motion for summary judgment will be denied, and disability insurance benefits will be awarded to plaintiff commencing January 10, 2003.

1

## II. Background

### A.  Procedural History

Plaintiff filed an application for DIB on October 8, 2003, alleging disability since January 10, 2003 due to fibromyalgia, erythema nodosum, asthma, osteo and rheumatoid arthritis, chronic fatigue and cold weather asthma.[1]  (R. 73-75, 90).  Following the denial of plaintiff's DIB application on January 23, 2004, she requested a hearing before an Administrative Law Judge ("ALJ").  (R. 44-47, 52-53).  At the hearing, which was held on September 14, 2004, plaintiff, who was represented by counsel, and a vocational expert ("VE") testified.  (R. 21-42).

On April 7, 2005, the ALJ issued a decision denying plaintiff's application for DIB.  Specifically, the ALJ concluded that plaintiff's impairments did not prevent her from performing her past relevant work as a secretary.  (R. 12-20).  Plaintiff requested review of the ALJ's decision.  However, the request was

---

[1]In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1).  A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

2

denied by the Appeals Council on July 29, 2005. (R. 4-8). This appeal followed.

## B. Facts

At the hearing before the ALJ on September 14, 2004, plaintiff testified as follows:[2]

Plaintiff suffers from a condition known as erythema nodosum, which she described as an infection that causes nodules under the skin, resulting in very painful, arthritis-like symptoms in the joints.[3] The nodules normally appear on plaintiff's shins, ankles and under her toes.[4] An outbreak lasts from six weeks to three months, and, after several weeks, the cycle starts again. When plaintiff has an outbreak, walking is very difficult, climbing stairs is "basically impossible," and standing is limited to less than five minutes. (R. 29-31).

Plaintiff also suffers from fibromyalgia which interferes with her ability to grip things with her hands,[5] chronic fatigue

---

[2]Plaintiff's date of birth is October 7, 1956. (R. 73). She was 47 years old on the date of the hearing before the ALJ. With respect to education, plaintiff completed high school and one year of business school. (R. 94).

[3]Plaintiff testified that she had suffered from this condition for eight years, and that there is no known cause, treatment or cure for this condition. (R. 31).

[4]Plaintiff testified that the nodules can range anywhere from the size of a pea to the size of a 50-cent piece. (R. 30).

[5]Plaintiff testified that due to her weak grip, she cannot write, open jars, lift things weighing more than three pounds, use a can opener, peel potatoes, hold a bar of soap, turn the

3

syndrome which makes her very tired due to "very sporadic sleep patterns,"[6] and headaches which occur approximately twice a week and last from 1 to 2 days.  Finally, plaintiff suffers from asthma which is aggravated by cold weather, humidity and fumes. She uses an Albuterol inhaler for the asthma.  (R. 32-35).  At the time of the hearing, Dr. Bajwa had been plaintiff's primary care physician for eight years, and Dr. Pollock, a rheumatologist, had been treating her for a year.  (R. 29).

As a result of her medical conditions, plaintiff is limited in her ability to sit due to hip pain.  Therefore, she lies down more than she sits.  Plaintiff's ability to walk is limited to a half a block at a time,[7] and she descends stairs on her buttocks. (R. 36).  Plaintiff's ability to stand is limited to "[v]ery, very short periods" ... "probably less than five minutes," and her ability to lift is limited to 3 pounds.  (R. 31, 33).

Plaintiff's husband does most of the housework, including dishes, laundry, cleaning, making beds and cooking.  (R. 38).

---

pages of a magazine or run the sweeper.  (R. 32-33).

[6]Plaintiff testified that she averages 3 to 3½ hours of sleep a night, which affects her ability to concentrate during the day.  (R. 34).  At the time of the hearing, plaintiff was taking Trazodone to help her sleep.  However, she testified that the medication did not work and its side effects included dizziness and headaches.  (R. 37).

[7]When asked by her attorney why she does not use a cane for assistance in walking, plaintiff testified that she cannot grip a cane with her hands due to the fibromyalgia.  (R. 31-32).

Although plaintiff has a driver's license, plaintiff's husband drove her to the hearing because she does not drive "long distances," which she equated to distances taking longer than 20 minutes. (R. 27). Plaintiff no longer has any hobbies and she does not belong to any clubs or organizations. (R. 37). In the past, plaintiff has worked as a chiropractic assistant, a secretary and an administrative assistant for a water company.[8] (R. 38).

## C. Medical Evidence of Record

### 1. Letter of Thaddeus A. Osial, Jr., M.D. - 12/12/97

In late 1997, plaintiff was evaluated by Dr. Thaddeus A. Osial, Jr., a rheumatologist, at the request of her then primary care physician, Lucille Aiken, M.D., in connection with her complaints relating to erythema nodosum. In a December 12, 1997 letter to Dr. Aiken concerning the evaluation, Dr. Osial noted that plaintiff "has quite typical erythema nodosum," although

---

[8]According to a Work History Report completed by plaintiff on November 19, 2003, she worked as an administrative assistant for a water authority from September 1978 through May 2002; she worked as a secretary for a trucking company in May 2002; she performed data entry work for a temporary employment agency in June 2002; and she worked as an assistant for two different chiropractors - the first between June 2002 and January 2003 and the second between February 2003 and April 2003. (R. 107-12).

The VE characterized plaintiff's employment as a chiropractic assistant as unskilled and light, her employment as a secretary as semi-skilled and sedentary and her employment as an administrative assistant as semi-skilled and medium. (R. 39).

5

precipitating events are unclear, and that he started plaintiff back on non-steroidal agents and would assess her response to these agents in a week or two.  (R. 216).

**2.  Records of Surinda S. Bajwa, M.D. - 2/4/98 to 10/15/03**

The administrative record in this case contains records of Dr. Surinda S. Bajwa, plaintiff's current primary care physician, covering the period between February 4, 1998 and October 15, 2003.  The records indicate that Dr. Bajwa saw plaintiff during that period for the following reasons:

(a) 2/4/98 - erythema nodosum (right knee and ankle pain) (R. 151-52);

(b) 5/29/98 - erythema nodosum (skin biopsy of multiple nodules on plaintiff's left shin showing "marked chronic inflammation") (R. 149);

(c) 9/15/98 - erythema nodosum (acute left ankle inflammation, walking with a limp) (R. 147-48);

(d) 1/12/99 - chest pain (R. 145, 148);

(e) 4/14/99 and 5/13/99 - left lower quadrant pain with constipation and some change in bowel pattern (R. 140-43);

(f) 5/3/01 and 6/12/01 - chest pain (R. 136-39, 160-61);

(g) 12/13/01 - history of burping (R. 135);

(h) 4/2/02 - annual physical examination (R. 135);

(i) 1/9/03 - right foot pain (diagnosed with metatarsalitis) (R. 135);

6

(j) 6/25/03 - body aches and pains (tests ordered to rule out rheumatoid arthritis) (R. 133); and

(k) 10/15/03 - dyspnea after any exertion (pulmonary function test was consistent with mild COPD, primarily chronic bronchitis) (R. 127-32).

**3. Records of Burton H. Pollock, M.D. - 8/29/03 to 11/14/03**

On August 29, 2003, plaintiff was seen by Dr. Burton H. Pollock, a rheumatologist, based on a referral by Dr. Bajwa.[9] Plaintiff reported trouble using her hands due to swelling, as well as pain in her knees and feet. Dr. Pollock described plaintiff's physical examination, in part, as follows:

                        *    *    *

NEUROLOGIC:     Deep tendon reflexes are +2 and equal.
                Equivocally positive Tinel's at the left
                wrist; it was negative later. Negative
                straight leg raising. No muscle atrophy or
                fasciculations. Normal gait.

---

[9]Dr. Pollock and Dr. Osial, the rheumatologist who evaluated plaintiff in late 1997 at the request of her primary care physician at that time, are partners in Margolis Rheumatology Associates - UPMC. According to the report prepared by Dr. Pollock on August 29, 2003 (which obviously is based on information supplied by plaintiff), shortly after plaintiff was evaluated by Dr. Osial in late 1997, she changed health insurance plans and was not able to return to Dr. Osial. She was then treated by a Dr. Bidula for several years who diagnosed her with erythema nodosum and osteoarthritis of the knees.  (R. 174). (The administrative record in this case does not contain any records pertaining to plaintiff's treatment by Dr. Bidula). Apparently, a further change in plaintiff's health insurance coverage enabled her to return to Margolis Rheumatology Associates - UPMC in 2003.

7

BACK:             Full range of painless motion throughout.

EXTREMITIES:      Shoulders - full range of motion.

                  Elbows - normal.

                  Wrists - normal.

                  Hands - normal.  There is good grip strength.
                  There is no swelling of any of the joints.

                  Hips - full range of motion.  She says she
                  gets a pain occasionally deep in that left
                  hip area.

                  Knees - crepitation in both knees, but there
                  is no fluid, and full range of motion.

                  Ankles - full range of motion.  Subtalars
                  have full range of motion without pain.

                  Feet - show bony enlargement of the right
                  greater than the left first MTP with
                  tenderness of the metatarsal heads.

(R. 174-78).

In his office notes relating to plaintiff's August 29, 2003

evaluation, Dr. Pollock described his impression as follows:

IMPRESSION

1.   History of chronic erythema nodosum; with questionable
     underlying inflammatory arthritis; either independent
     of that or related to that.  Note the bouts of erythema
     nodosum are lasting longer and the joint pains are
     getting more intense, particularly in the hands.  She
     is having more and more trouble with activities of
     daily living.
2.   Equivocally positive Tinel's sign of the left hand.
3.   History of osteoarthritis of the knees.

(R. 199).

8

Plaintiff returned to Dr. Pollock on September 12, 2003 for complaints of "generalized fatigue, particularly in the morning" for "the last six months or so" and joint pain. Dr. Pollock noted that plaintiff had been diagnosed clinically with erythema nodosum of unknown etiology, and he opined that plaintiff was suffering from the onset of fibromyalgia. Dr. Pollock prescribed medication for plaintiff to take at bedtime to help her sleep. (R. 199).

On October 21, 2003, plaintiff called Dr. Pollock's office to report that she was experiencing constipation and dizziness from her prescribed medication, and that her fingers were very painful and stiff although they were not swollen. In response, Dr. Pollock prescribed a different medication. (R. 197).

On November 14, 2003, plaintiff returned to Dr. Pollock with complaints of increased pain, an inability to sleep and problems with her hands, *i.e.*, she could not lift a can of soup, open a jar or grip the steering wheel of a car. Dr. Pollock increased plaintiff's dosage of Elavil and ordered bloodwork. (R. 198, 200, 202-04).

**4. Letter of Burton H. Pollock, M.D. - 12/16/03**

On December 16, 2003, Dr. Pollock wrote the following letter to John Doran, D.O. of the Pennsylvania Bureau of Disability Determination, concerning his treatment of plaintiff:

Dear Dr. Doran:

9

I will enclose for your records a copy of our initial history and physical examination that we did on Diane Sharick. She has had recurrent bouts of idiopathic erythema nodosum in the past and apparently she has had evidence of a positive rheumatoid factor and ANA but, at this point, these tests are normal and I could not find any evidence of active inflammatory disease. At this point, I think she has a lot of pain and fatigue on the basis of generalized fibromyalgia. She does not sleep well and I think this exacerbates the problem. Recently, she has had more discomfort in her hands and trouble opening jars and lifting anything but I could not detect any signs of inflammation on her most recent visit.

I did increase her Elavil to 50 mg. at bedtime. I hope that she will be able to sleep better with this and this in turn may alleviate some of her discomfort. At this point, she is disabled because of pain but there are no objective findings. There does not appear to be any underlying inflammatory arthritis or connective tissue disease.

Sincerely,
Burton H. Pollock, M.D.

(R. 173).

**5. Report of Consultative Examination by Lloyd K. Richless, M.D. - 12/20/03**

On December 20, 2003, plaintiff underwent a consultative examination by Dr. Lloyd K. Richless at the request of the Pennsylvania Bureau of Disability Determination. Regarding his physical examination of plaintiff, Dr. Richless noted, among other things, that plaintiff was able to sit and stand comfortably throughout the examination without difficulty "although she did complain of fatigue when standing and preferred to lean against the examination table;" that plaintiff's hands were normal in temperature, not swollen or red, did not have

10

crepitus with finger motion and were able to engage in fine dexterous motions, although plaintiff complained of pain with all hand motions; that plaintiff's grip strength was 4/5 bilaterally with a "giveaway quality to hand strength testing," requiring encouragement to maintain a grip; and that plaintiff had some lesions on her right lower extremity and multiple resolving erythematous lesions on both lower extremities consistent with erythema nodosum. Dr. Richless's assessment of plaintiff's medical conditions included the following: (1) fibromyalgia, (2) chronic fatigue which may be related to fibromyalgia, (3) mild osteoarthritis history primarily affecting plaintiff's knees and (4) hand pain of unclear etiology (noting that plaintiff's complaints of pain in her hands "far exceeded objective findings"). (R. 181-85).

Dr. Richless also completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities in which he opined that plaintiff could frequently lift and carry 2 to 3 pounds and occasionally lift and carry 10 pounds; that plaintiff could stand and walk for 6 or more hours in an 8-hour workday; that plaintiff's ability to sit was unlimited; that plaintiff's ability to push and pull was unlimited other than as shown for lifting and carrying; that plaintiff could occasionally engage in all postural activities, i.e., bending, kneeling, stooping, crouching, balancing and climbing; that plaintiff was

11

limited with respect to handling and fingering due to subjective
complaints of pain and fatigue; and that plaintiff had no
environmental limitations. (R. 179-80).

**6. Residual Physical Functional Capacity Assessment -
1/15/04**

On January 15, 2004, a state agency physician completed a
Residual Physical Functional Capacity Assessment in connection
with plaintiff's application for DIB based on a review of her
file, indicating that plaintiff could occasionally lift and carry
50 pounds and frequently lift and carry 25 pounds; that plaintiff
could stand and/or walk about 6 hours in an 8-hour workday; that
plaintiff could sit about 6 hours in an 8-hour workday; that
plaintiff's ability to push and pull was unlimited, other than as
shown for lifting and carrying; that plaintiff had no postural,
manipulative or communicative limitations; and that plaintiff's
only environmental limitation was avoidance of concentrated
exposure to fumes, odors, dusts, gases and poor ventilation due
to her history of asthma. (R. 186-93).

**7. Records of Burton H. Pollock - 4/21/04 to 5/28/04**

Dr. Pollock's office notes indicate that he saw plaintiff on
April 21, 2004 for continued complaints of pain and an inability
to sleep. In response, Dr. Pollock prescribed Trazodone for
plaintiff. (R. 196). The office notes further indicate that
plaintiff called Dr. Pollock on May 28, 2004 to report that the

12

Trazodone was not helping her sleep; that she was only sleeping 3 hours at a time, and that her pain level remained the same. In response, plaintiff was instructed to increase her dosage of Trazodone. (R. 201).

## 8. Letter of Burton H. Pollock, M.D. - 9/1/04

On September 1, 2004, Dr. Pollock wrote a letter to plaintiff's counsel concerning his treatment of plaintiff. In the letter, Dr. Pollock indicated that plaintiff's diagnoses included (1) chronic idiopathic erythema nodosum, (2) slight positive rheumatoid factor and ANA, but no evidence at any time of underlying inflammatory arthritis such as rheumatoid arthritis, and (3) generalized fibromyalgia characterized by pain, poor sleep, poor concentration and multiple tender points. Dr. Pollock opined that plaintiff's joint pain was related to her generalized fibromyalgia, rather than the erythema nodosum. Noting plaintiff's difficulties with sleep and the different medications that had been prescribed to help her sleep, Dr. Pollock stated: "We have found that people who have fibromyalgia, if we can improve their sleep pattern, they may hurt less." Dr. Pollock concluded his letter as follows:

\* \* \*

The prognosis then is uncertain but probably not good for recovery as the pains have been getting worse rather than better and she has not responded to the usual treatments for fibromyalgia. She has generalized fibromyalgia which, at this point, would interfere with her working because she has

13

pain which prevents her from doing any significant physical
work. I cannot specifically quantitate how much she can do
because, on different days, she would be capable of doing
more than on other days. As a general rule, because of the
pain that she has, she would not be able to work a normal
day with any regularity. She certainly could not be doing
any lifting, squatting, pushing or crawling which you asked
for on the evaluation sheet. She does have a full range of
motion in all of her joints but with pain.

\*     \*     \*

(R. 194-95).

**9. Report of Consultative Psychological Evaluation -**
**10/26/04**

On October 26, 2004, following the hearing before the ALJ,
plaintiff underwent a psychological evaluation by John Carosso,
Psy.D., a licensed psychologist, at the request of the
Pennsylvania Bureau of Disability Determination. Based on the
results of testing, Dr. Carosso indicated that plaintiff showed
"mild symptoms of depression," and he indicated, among other
things, in the Discussion section of his report that plaintiff
"would likely have difficulty with short-term memory and
comprehension as indicated by her performance on the MMSE;" that
plaintiff "may have difficulty with fatigue and limited physical
ability such is (sic) standing, lifting, and bending;" that
plaintiff "may have some difficulty with sustained attention if
she were experiencing chronic pain;" and that plaintiff's
"employers would need to be sympathetic and accommodating to her
medical problems." Dr. Carosso described plaintiff's prognosis

14

as "[g]uarded given her numerous medical problems," he diagnosed
plaintiff with Adjustment Disorder, Unspecified, and he rated
plaintiff's score on the Global Assessment of Functioning Scale
as a 57.[10] (R. 217-24).

In a questionnaire regarding capabilities, Dr. Carosso
indicated, in relevant part, that plaintiff would be markedly
restricted in her ability to carry out short, simple instructions
due to her physical problems, and that plaintiff would be
moderately restricted in her ability to interact appropriately
with the public due to her limited physical abilities. (R. 225-
26).

## III. Legal Analysis

### A. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.
§ 405(g), which provides that an individual may obtain judicial
review of any final decision of the Commissioner by bringing a
civil action in the district court of the United States for the
judicial district in which the plaintiff resides.

---

[10]The Global Assessment of Functioning Scale considers
psychological, social and occupational functioning on a
hypothetical continuum of mental health to illness. The highest
possible score is 100 and the lowest is 1. A score between 51
and 60 denotes moderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) or moderate
difficulty in social, occupational or school functioning (e.g.,
few friends, conflicts with peers or co-workers). Diagnostic and
Statistical Manual of Mental Disorders (DSM IV), at 30-32.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance. Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence. Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

### B. The 5-Step Sequential Evaluation Process

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

*   *   *

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity. 20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the

16

Commissioner must determine whether the claimant is
suffering from a severe impairment.   20 C.F.R.
§ 404.1520(c).   If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.   20 C.F.R. § 404.1520(d).   If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.   Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.   20 C.F.R.
§ 404.1520(d).   The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.   Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.   At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability.   20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity.   The ALJ must analyze the
cumulative effects of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.

Plummer, 186 F.3d at 428.

*   *   *

220 F.3d at 118-19.

With respect to the ALJ's application of the five-step

sequential evaluation process in the present case, steps one and

two were resolved in plaintiff's favor: that is, the ALJ found

that plaintiff had not engaged in substantial gainful activity
since her alleged onset date of disability,[11] and that plaintiff
suffers from fibromyalgia, erythema nodosum, asthma and an
adjustment disorder which are severe impairments within the
meaning of the Social Security Regulations. (R. 13, 16).
Turning to step three, the ALJ found that plaintiff's impairments
were not sufficiently severe to meet or equal the requirements of
any impairment listed in Part 404, Subpart P, Appendix 1 of the
Social Security Regulations, relating to the musculoskeletal
system (Listing 1.00), the respiratory system (Listing 3.00) and
mental disorders (Listing 12.00).[12]  (R. 16).  As to step four,
the ALJ found that plaintiff retained the residual functional
capacity to perform her past work as a secretary,[13] which was
sedentary.[14]  (R. 18).  Despite finding that plaintiff could

[11]With respect to plaintiff's employment as a chiropractic
assistant after her alleged onset date of disability, the ALJ
found that this employment was only part-time (three hours a day
for two months) and did not constitute substantial gainful
activity.  (R. 13).

[12]Plaintiff has not challenged the ALJ's determination that
she did not meet a listed impairment.

[13]Residual functional capacity is defined in the Social
Security Regulations as "the most a disability claimant can still
do despite his or her limitations."  20 C.F.R. § 404.1545(a).

[14]The Social Security Regulations define this level of work
as follows: "Sedentary work involves lifting no more than 10
pounds at a time and occasionally lifting or carrying articles
like docket files, ledgers, and small tools.  Although a
sedentary job is defined as one which involves sitting, a certain
amount of walking and standing is often necessary in carrying out

18

perform her past work as a secretary, and that, therefore, plaintiff did not meet her burden at step four of showing disability, the ALJ did not end his inquiry. Rather, he proceeded to step five and found that even if plaintiff was unable to perform her past work as a secretary, there were a significant number of sedentary, unskilled jobs existing in the national economy which she could perform despite her impairments, although he did not specifically identify any jobs.[15]

---

job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  See 20 C.F.R. § 404.1567(a).

[15]With respect to the ALJ's continuation to step five of the sequential evaluation process despite his finding at step four that plaintiff was not disabled because she could perform her past work as a secretary, the ALJ based his step five determination on the Medical-Vocational Guidelines set forth in Appendix 2 to Subpart P of Part 404 of the Social Security Regulations, which are commonly referred to as the "grids."  The grids consist of a matrix of four factors - physical ability, age, education and work experience - and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to a rule, the guidelines direct a conclusion that work exists which the claimant can perform.

In a case, such as this one, in which a claimant suffers from non-exertional impairments (as opposed to only exertional impairments), the Commissioner may not determine that the non-exertional impairments do not significantly erode the occupational base underlying the grids without either: (1) taking vocational evidence to establish that fact, or (2) providing notice to the claimant of her intent to take official notice of that fact, along with an opportunity to counter such conclusion. See Sykes v. Apfel, 228 F.3d 259 (3d Cir.2000).  In the present case, the ALJ did not elicit such vocational evidence and there is no evidence that plaintiff was given the necessary notice and opportunity to counter such a conclusion.  Accordingly, the ALJ's

19

## C. Discussion

Essentially, plaintiff raises two arguments in support of her motion for summary judgment. First, plaintiff asserts that the ALJ's determination that she is not disabled by fibromyalgia is not supported by substantial evidence.[16] Second, plaintiff asserts that the ALJ erred by failing to set forth her non-exertional limitations, including the non-exertional limitations resulting from her mental impairment, in a hypothetical question to the VE to elicit testimony regarding her ability to engage in substantial gainful activity in light of such limitations.[17] On

---

step five determination is lacking in substantial evidence. In any event, the proper focus of this appeal is the ALJ's determination at step four that plaintiff failed to meet her burden of establishing disability.

[16]Plaintiff's first argument consists of four parts. First, plaintiff asserts that her testimony and the records and opinion of Dr. Pollock, her treating rheumatologist, establish that she is disabled by fibromyalgia. Second, plaintiff asserts that the ALJ's discussion of Dr. Pollock's opinion that she is disabled by fibromyalgia is "wholly inadequate." Third, plaintiff asserts that the ALJ's dismissal of her testimony and Dr. Pollock's opinion that she is disabled by fibromyalgia on the basis of a lack of objective medical evidence is not supported by case law, Social Security Regulations or policy statements set forth in Social Security Rulings. Fourth, and finally, plaintiff asserts that the ALJ mischaracterized her statements regarding activities of daily living to undermine her credibility and support his determination that she was not disabled as a result of fibromyalgia.

[17]The ALJ's questioning of the VE was limited to determining the exertion and skill levels of plaintiff's past relevant work. He did not ask any hypothetical questions of the VE to elicit testimony regarding the specific jobs which plaintiff could perform despite her limitations.

20

the other hand, the Commissioner argues that she is entitled to summary judgment because (1) the ALJ's determination that plaintiff can perform her past relevant work as a secretary is supported by substantial evidence, and (2) since this case was decided at step four of the sequential evaluation process while the burden to show disability was still on plaintiff, the ALJ was not required to elicit testimony from the VE concerning other work existing in significant numbers in the national economy which plaintiff could perform despite her limitations.

i

Turning first to plaintiff's argument regarding the ALJ's alleged error in failing to ask a hypothetical question of the VE which incorporated all of her non-exertional limitations, the Court concludes that this argument is meritless. As noted by the Commissioner, because this case was decided at step four, rather than step five, of the sequential evaluation process, the burden did not shift to the Commissioner to produce evidence of jobs existing in significant numbers in the national economy which plaintiff could perform despite her limitations. (Df's Brief in Support, pp. 12-13). Thus, the failure of the ALJ to elicit VE testimony on this issue was not erroneous.

21

ii

As to the ALJ's determination that plaintiff was not disabled as a result of fibromyalgia, after careful consideration of the entire record, case law and the arguments of the parties in support of their respective motions for summary judgment, the Court concludes that the ALJ's determination at step four of the sequential evaluation process that plaintiff could perform her past relevant work as a secretary despite her limitations is not supported by substantial evidence.

With respect to a claim of disability based on fibromyalgia, in Sarchet v. Chater, 78 F.3d 305 (6th Cir.1996), the United States Court of Appeals for the Sixth Circuit stated in relevant part:

* * *

Marlin Sarchet was denied social security disability
benefits, challenged the denial in the district court, lost,
appeals.  She is 42 years old, with a graduate equivalency
degree, but she has not worked since 1978.  She claims that
in 1990 she became totally disabled as a consequence of
fibromyalgia, also known as fibrositis - a common, but
elusive and mysterious, disease, much like chronic fatigue
syndrome, with which it shares a number of features.  *See*
Frederick Wolfe et al., "The American College of
Rheumatology 1990 Criteria for the Classification of
Fibromyalgia: Report of the Multicenter Criteria Committee,"
33 *Arthritis & Rheumatism* 160 (1990); Lawrence M. Tierney,
Jr., Stephen J. McPhee & Maxine A. Papadakis, *Current
Medical Diagnosis & Treatment 1995* 708-09 (1995).  Its cause
or causes are unknown, there is no cure, and, of greatest
importance to disability law, its symptoms are entirely
subjective.  There are no laboratory tests for the presence
or severity of fibromyalgia.  The principal symptoms are
"pain all over," fatigue, disturbed sleep, stiffness, and -

22

the only symptom that discriminates between it and other diseases of a rheumatic character - multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. There is no serious doubt that Sarchet is afflicted with the disease but it is difficult to determine the severity of her condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 *British Med.J.* 386 (1995); Preston v. Secretary of Health & Human Services, 854 F.2d 815, 818 (6ᵗʰ Cir.1988)(per curiam), but most do not and the question is whether Sarchet is one of the minority.

\* \* \*

78 F.3d at 306-07.[18]

See also Preston v. Secretary of Health and Human Services, 854

F.2d 815 (6ᵗʰ Cir.1988)("... the CT scans, X-rays, and minor

physical abnormalities noted by these doctors and cited by the

Secretary as substantial evidence of no disability ..., are not

highly relevant in diagnosing fibrositis or its severity. As

noted in the medical journal articles in the record, fibrositis

---

[18]Social Security Ruling 99-2p, which restates and clarifies the policies of the Social Security Administration for developing and evaluating disability claims based on Chronic Fatigue Syndrome ("CFS"), notes that there is considerable overlap of symptoms between CFS and fibromyalgia and acknowledges that they are both medically determinable impairments, and the Court notes that in Chrupcala v. Heckler, 829 F.2d 1269 (3d Cir.1987), the United States Court of Appeals for the Third Circuit recognized fibrositis as a disabling condition.

patients manifest normal muscle strength and neurological reactions and have a full range of motion."); Hirschfeld v. Apfel, 159 F.Supp.2d 802 (E.D.Pa.2001)("Fibromyalgia, also called fibrositis, is a disease involving muscle and musculoskeletal pain....  Its causes are unknown, it is currently incurable, and there are no laboratory tests for its presence or severity.... Its symptoms are entirely subjective and include pain, fatigue, disturbed sleep, stiffness, and multiple tender spots on the body."); Ward v. Apfel, 65 F.Supp.2d 1208 (D.Kan.1999)("Courts have recognized that the pain suffered by those diagnosed with fibromyalgia can be disabling....  The symptoms of fibromyalgia are entirely subjective, and there are no laboratory tests to identify its presence or severity."); Runyon v. Apfel, 100 F.Supp.2d 447 (E.D.Mich.1999)("The Commissioner claims that Dr. Wright's opinion [that the claimant would be unable to lift, carry, bend, sit, stand or walk] was reasonably rejected because he did not substantiate his limitations with objective medical findings, and his findings were inconsistent with the predominantly normal objective medical findings of other physicians.  While this is a valid basis for discounting an opinion in most cases, fibromyalgia is different."); Aidinovski v. Apfel, 27 F.Supp.2d 1097 (N.D.Ill.1998)("Here ALJ Holtz found that Aidinovski's subjective complaints were not credible, basing that decision primarily on the lack of objective evidence and on

24

the inconsistency between Aidinovski's subjective complaints and the negative objective evidence.... Yet ALJ Holtz did not consider - or at least she did not discuss - the particularly subjective nature of fibromyalgia symptoms and their role in assessing Aidinovski's credibility. ALJ Holtz did not acknowledge even once that the disease raises uniquely challenging issues for a disability determination because the objective evidence in a fibromyalgia case generally does not substantiate the patient's potentially severe complaints.").

In rendering his adverse decision in the present case, the ALJ relied primarily on the absence of objective medical evidence to support plaintiff's complaints of disabling pain due to fibromyalgia, stating:

\* \* \*

... The evidence fails to establish that the claimant's pain is so severe and intractable as to prevent the performance of all work activity. In reaching this conclusion, the undersigned has specifically considered the limitations and impairments alleged in the claimant's testimony and documentary record and finds that they are only partially credible. The *lack of objective evidence and clinical findings in the record* are out of proportion to the claimant's subjective complaints and do not support a conclusion that the limitations are of an intensity, frequency, or duration as to preclude the performance of all work activity (SSR 96-7p). (Emphasis added).

\* \* \*

The undersigned has considered the opinion of Dr. Pollock who concludes the claimant is unable to work. However, it

is noted that he also admits *there are few objective findings in this case*.[19]   (Emphasis added).

Dr. Richless (Exhibit 4F) also indicates that *the claimant's complaints exceed the objective findings*.  However, he did complete an assessment form which essentially falls into the sedentary range of work do (sic) to lifting limitations. (Emphasis added).

\*   \*   \*

(R. 17).

As noted by plaintiff, in relying so heavily on the absence of

objective medical evidence to deny her claim for disability

insurance benefits based on disabling pain due to fibromyalgia,

the ALJ "seemingly failed to understand that this impairment can

form the basis for a disability claim, even in the absence of

objective findings."[20]   (Pl's Brief in Support, pp. 12-13).

---

[19]With respect to the ALJ's rejection of Dr. Pollock's opinion that plaintiff is disabled as a result of fibromyalgia, the Court agrees with plaintiff that his short, two-sentence statement for rejecting the opinion is inadequate.  (Pl's Brief in Support, pp. 11-12).  The Social Security Regulations specifically provide that "good reasons" will always be given in the notice of decision for the weight given to an opinion of a claimant's treating source.  See 20 C.F.R. § 404.1527(d)(2). Other than the lack of objective medical evidence to support plaintiff's complaints of disabling pain which is present in all cases alleging disability due to fibromyalgia, the ALJ failed to provide an explanation of his reason for rejecting Dr. Pollock's opinion.

[20]In fact, the Court notes that the ALJ never mentioned the peculiar nature of the disease of fibromyalgia in his decision despite the abundance of disability case law addressing this very issue.  In this connection, "[w]hen a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'"  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999), citing, Mason v. Shalala,

Based on the case law cited above, it is clear that the ALJ erred in denying plaintiff's claim for benefits based predominantly on the lack of objective medical evidence to support her complaints of disabling pain due to fibromyalgia.

Further, the Court concludes that the ALJ failed to accord proper weight to the opinion of Dr. Pollock that plaintiff was unable to work due to fibromyalgia. As noted by plaintiff, the Social Security Regulations and case law establish a clear preference for opinions of treating sources. (Pl's Brief in Support, pp. 6-7). Moreover, as a specialist in rheumatology, Dr. Pollock's opinion should have been accorded even greater weight.[21]  Section 404.1527(d)(5) of the Social Security Regulations provides: "We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  Nevertheless, the ALJ chose to accord more weight to the opinion of Dr. Richless, a one-time examining physician

---

994 F.2d 1058, 1066 (3d Cir.1993)(Emphasis added).

The Court further notes that the Commissioner similarly failed to discuss the unique difficulties presented by disability claims based on fibromyalgia in the brief filed in support of her motion for summary judgment, emphasizing instead the lack of clinical findings, diagnostic findings or other medical evidence of record to support Dr. Pollock's opinion that plaintiff is disabled by fibromyalgia. (Df's Brief in Support, pp. 8-9).

[21]"Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist."  Sarchet, 78 F.3d at 307.

whose specialty, if any, is unknown, that plaintiff was capable of performing sedentary work despite her limitations from fibromyalgia,[22] than to the opinion of Dr. Pollock, a specialist in rheumatology who had been treating plaintiff for fibromyalgia for over a year at the time of the hearing.

Finally, the Court agrees with plaintiff that the ALJ mischaracterized the questionnaire she completed concerning her activities of daily living to support his finding that her complaints of disabling pain due to fibromyalgia were not credible. Specifically, the ALJ states in his decision that plaintiff indicated in Exhibit 4E that she "shops, does light household chores, and can climb stairs." (R. 17). Contrary to this characterization of plaintiff's responses, the questionnaire indicates that plaintiff requires the assistance of store employees and her husband to load and unload grocery bags from her car, cannot carry any grocery bags herself and needs to rest while shopping; that plaintiff relies "completely" on her husband and children to do household chores and cooking; and that plaintiff has a "serious problem climbing steps," requiring her "at times" to go up and down stairs on her "back side due to leg, knee, muscle and joint pains." (R. 99-100). Simply put, there

---

[22]Significantly, Dr. Richless is the only examining physician to express an opinion that is contrary to the opinion of Dr. Pollock that plaintiff is disabled by fibromyalgia.

is nothing in Exhibit 4E to undermine plaintiff's claim of
disabling pain due to fibromyalgia. Moreover, plaintiff's
responses to the questions in Exhibit 4E are entirely consistent
with her testimony at the hearing before the ALJ.[23]

For all the foregoing reasons, the Court concludes that the
ALJ's decision is not supported by substantial evidence, and,
therefore, the decision will be reversed.

William L. Standish
United States District Judge

Date: December 18, 2006

---

[23]Even if the ALJ's characterization of plaintiff's responses
to the questionnaire concerning her activities of daily living
were accurate, the Court notes that these activities do not
undermine plaintiff's claim of an inability to work on a regular
and sustained basis, i.e., 8 hours a day, 5 days a week. See,
e.g., Smith v. Califano, 637 F.2d 968, 971-72 (3d Cir.1981)
(Sporadic or transitory activity of disability insurance benefits
claimant does not disprove disability).

29